```
           IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TENNESSEE
                      WESTERN DIVISION
_____

UNITED STATES OF AMERICA,      )
                               )
     Plaintiff,                )
                               )
v.                             )    No. 20-cr-20101-MSN-tmp
                               )
STONE COLLINS,                 )
                               )
     Defendant.                )
_____

                    REPORT AND RECOMMENDATION
_____
```

Before the court by order of reference is a motion to suppress filed by defendant Stone Collins. For the reasons below, it is recommended that the motion to suppress be granted.

## I.  PROPOSED FINDINGS OF FACT

The following proposed findings of fact are based on the testimony of Memphis Police Department ("MPD") Officer Trace Cisneros, MPD Officer Nacarious Lucas, and Shelby County Assistant District Attorney Paul Hagerman, all three of whom testified at an evidentiary hearing held before the undersigned magistrate judge. Audio-video recordings from body cameras worn by Officers Cisneros and Lucas, as well as by MPD Officer Dustin Beard (who did not testify at the hearing), were admitted into evidence. (Hr'g Exs. 8-10.)

On October 31, 2019, at around 2:55 p.m., Officer Cisneros went to the Pendleton West Apartments ("Pendleton West") in Memphis, Tennessee, to interview a suspect in connection with a recent homicide. Officer Cisneros is assigned to the MPD's Airways Station Task Force, which is tasked with going into high crime areas. As Officer Cisneros walked through a gate on the east side of the apartment complex, he observed two men walking out of the complex. Because Pendleton West was a participant in the Shelby County District Attorney General Anti-Trespass Program, Officer Cisneros decided to approach the men to determine if they were trespassing.[1] His decision to approach them was in no way related to the homicide investigation.

Officer Cisneros, who was working alone, walked up to the men and asked if they had proof of identification on them. One of the individuals, later identified as defendant Stone Collins, said he did not have any identification on him. Officer Cisneros noticed that Collins was wearing a hooded sweatshirt and had both of his hands tucked inside the front pocket of his sweatshirt. Officer

---

[1] The Shelby County District Attorney General Anti-Trespass Program, which was initiated in 2008 in an effort to reduce crime, encourages owners of apartment complexes in the Memphis area to restrict access to their property to tenants and their invited guests. Pendleton West is a participant in the program and has anti-trespassing signs posted throughout the property. (Affidavit, Hr'g Ex. 2; Photographs, Hr'g Exs. 4 & 5.)

Cisneros was concerned for his safety because he could not see Collins's hands. Officer Cisneros said, "show me your hands," but Collins did not comply. The officer repeated, "show me your hands," and this time Collins removed only his left hand from his sweatshirt. Officer Cisneros then said, "show me your other hand," but Collins continued to keep his right hand in his sweatshirt. With his right hand still hidden, Collins started to back away from the officer. Officer Cisneros testified that Collins bladed his body, which indicated to him that Collins was about to flee. At that point, Officer Cisneros reached out to grab Collins "because he was being detained[.]" Officer Cisneros testified that he could see the butt of a handgun inside Collins's sweatshirt pocket. Officer Cisneros and Collins began to struggle, and during the altercation a gun fell out of Collins's sweatshirt. Officer Cisneros eventually succeeded in wrestling Collins to the ground. Officers Lucas and Beard arrived on the scene and assisted in detaining Collins and recovering the handgun. Collins was subsequently indicted for unlawful possession of a firearm by a convicted felon.

At the evidentiary hearing, Officer Cisneros's testimony was somewhat unclear regarding when and how he was able to see the handgun inside Collins's sweatshirt. On direct examination, the officer's testimony seemed to indicate that he saw the gun before

- 3 -

grabbing Collins and that Collins's right hand was still in his sweatshirt:

> [Collins] kind of slightly removed [his right hand] but didn't pull [his] hand all the way out and then started backing away from me. At the same time he was backing away from me, I reached out to grab him. As I reached out to grab him, I could see the brown handle of a handgun in his right hoodie pocket. I then grabbed his right arm where his hand was in his pocket. I then heard the metallic sound of a handgun hitting the concrete. He slipped his arm out of his hoodie. I was still hanging on to the sleeve of his hoodie. I then wrestled him to the ground, took him into custody.

(Tr. at 32.) On cross-examination, when questioned about the body camera recordings that showed him describing to the other officers at the scene his encounter with Collins, he testified as follows:

> [Defense counsel]: What we actually witnessed you tell Officer Beard and Officer Lucas is that as he had one hand in, you grabbed his arm or his hand, and that's when you could see the butt of the gun. That was your earlier testimony as well; is that correct?
>
> [Officer Cisneros]: My earlier testimony was that he had his hand in his hoodie. He gave me a slight, like he was trying, like he wasn't going to pull his hand completely out of his hoodie, but he give me like a – I don't even know how to describe it. Then he started to back away from me. At the same time, I reached for him because he was being detained at that moment. And at that moment when I'm reaching for him, that is when I see the gun. It all happened almost at the exact same time.

(Tr. at 70.)[2] On re-direct examination, however, Officer Cisneros testified that Collins removed his right hand from his pocket, which enabled Cisneros to see the gun before grabbing him:

> As I approached him, he had both hands in his pocket. And then I asked him to remove his hands, he kind of did this (demonstrating). I told him to remove his hands again. He removed this one. And I could see like the palm kind of his hand, and that's when he started to walk away, and he bladed his body. That's when I reached for him because he was blading his body, I knew he was attempting to flee. So I reached for him, I reached for his hand when he had it out, and that's when I saw the handgun (demonstrating).

(Tr. at 76-77.)

Officer Cisneros's testimony is at odds with the description of his encounter with Collins that he gave to his fellow officers at the scene. The body camera recordings capture Officer Cisneros describing his encounter with Collins as follows:

> [Collins] had his hand in his hoodie like this [*Officer Cisneros imitating Collins having right hand in his pocket*]. I said, "show me your hand." He kept it in there, so I grabbed his hand. I could see the butt of the pistol in there. Then he tried to take off on me.

---

[2]Because Officer Cisneros did not activate his body camera until after Collins was taken into custody, there is no video recording of the officer's initial encounter with Collins. Officer Cisneros testified he had no reason to activate his body camera when he first approached Collins because his intention was simply to check if he and his companion were trespassing. Officers Lucas and Beard did not arrive on the scene until after Officer Cisneros was able to subdue Collins, so their body cameras also do not document the initial encounter.

(Ex. 8, at 1:42; Ex. 9, at 2:30.) Additional recordings from the body cameras worn by Officers Cisneros and Beard show Officer Cisneros describing to another officer the encounter as follows:

> [Collins] had his hands in his pockets. I said, "get your hands out of your pockets." He did this [*Officer Cisneros imitating Collins removing left hand from pocket*]. I said, "get your other hand out." He started doing this [*Officer Cisneros imitating Collins stepping back*], and I grabbed his arm real quick. I could see the butt of the gun. He tried to take off running, and it fell out of his pocket.

(Ex. 8, at 5:35; Ex. 10, at 6:40.) In both instances, Officer Cisneros told the responding officers that he grabbed Collins's arm and then saw the butt of the gun. This sequence of events also makes sense because Collins was trying to hide the gun by keeping his right hand in his pocket, and the gun likely would not have been visible to Officer Cisneros until he grabbed Collins's arm. The undersigned finds that Officer Cisneros did not see the butt of the handgun until immediately *after* he grabbed Collins's arm.

## II. PROPOSED CONCLUSIONS OF LAW

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. "The Supreme Court has identified three types of reasonable, and thus permissible, warrantless encounters between the police and citizens: (1) consensual encounters, which may be

initiated by a police officer based on a mere hunch or without any articulable reason whatsoever; (2) investigative stops (or Terry stops), which are temporary, involuntary detentions and which must be predicated upon 'reasonable suspicion;' and (3) arrests, which must be based upon 'probable cause.'" United States v. Dickens, 748 F. App'x 31, 35-36 (6th Cir. 2018) (quoting United States v. Pearce, 531 F.3d 374, 380 (6th Cir. 2008)).

When Officer Cisneros initially approached Collins and asked for identification, the officer was engaging in a consensual encounter that did not require any suspicion that Collins was involved in criminal conduct. "Law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." Illinois v. Lidster, 540 U.S. 419, 425 (2004) (quoting Florida v. Royer, 460 U.S. 491, 497 (1983)). Furthermore, "the Fourth Amendment is not implicated when officers merely ask suspects for identification or approach them in public spaces and ask questions in non-threatening ways." United States v. Ward, 756 F. App'x 560, 564-65 (6th Cir. 2018); see also Hiibel v. Sixth Judicial Dist. Ct. of Nev., 542 U.S. 177, 185 (2004) ("In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth

Amendment."). As the Sixth Circuit has held, "[w]here the police ask questions of an individual, ask to examine the individual's identification, and do not otherwise threaten punishment for noncompliance, there is no seizure." Ward, 756 F. App'x at 565 (citing Florida v. Bostick, 501 U.S. 429 (1991)); see also Hiibel, 542 U.S. at 185 ("[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure.") (quoting INS v. Delgado, 466 U.S. 210, 216 (1984)). During his initial encounter with Collins, Officer Cisneros was by himself, did not display a weapon, did not accuse Collins of committing a crime, and had not (yet) made any physical contact with Collins. Officer Cisneros merely approached Collins and his companion and asked if they had any identification – a consensual encounter, not a seizure. See United States v. Foster, 376 F.3d 577, 584 (6th Cir. 2004) ("When [the police officer] first addressed Foster, [the officer] asked Foster his name, what he was doing there, and whether he had any identification on him. This is permitted under Fourth Amendment precedent.").

While Officer Cisneros's initial contact with Collins was merely a consensual encounter, the situation arguably escalated to a seizure when the officer ordered Collins to show his hands. Compare United States v. Brodie, 742 F.3d 1058, 1061 (D.C. Cir.

- 8 -

2014) ("The government concedes that the police made a show of authority when they ordered Brodie to put his hands on the car.") with United States v. Lewis, 843 F. App'x 683, 689 (6th Cir. 2021) (officer *asking* defendant to take his hand out of his pocket and *asking* for his name did not amount to a seizure) (emphasis added). Law enforcement can "seize" a person through the use of physical force or by a "show of authority that in some way restrain[s] the liberty of the person." Torres v. Madrid, 141 S. Ct. 989, 995 (2021) (quoting Terry v. Ohio, 392 U.S. 1, 19 (1968)) (internal quotations omitted). The "application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued." Id. at 1003. "Unlike a seizure by force, a seizure by acquisition of control involves either voluntary submission to a show of authority or the termination of freedom of movement." Id. at 1001.

Whether Collins was seized at this stage of the encounter is a close question. Even though Officer Cisneros instructed Collins three times to show his hands, Collins only partly complied by removing his left hand but refusing to remove his right hand and then backing away. "The police 'may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission.'" Ward, 756 F. App'x at 566 (quoting Brendlin v. California, 551 U.S. 249, 254 (2007)). "[W]hen

- 9 -

there is no actual submission, 'there is at most an attempted seizure, so far as the Fourth Amendment is concerned.'" Id. (quoting Brendlin, 551 U.S. at 255). Had Collins fully complied with the officer's instructions and taken both hands out of his sweatshirt, such conduct might have been consistent with an actual submission, resulting in a Fourth Amendment seizure. See Brodie, 742 F.3d at 1061 (holding that defendant was seized under the Fourth Amendment when he obeyed police instruction to put his hands on the car, even though he fled a few seconds later, because defendant submitted to the show of authority by momentarily complying with the police's order). However, it is less clear whether Collins's partial compliance with Officer Cisneros's orders to show his hands qualifies as an actual submission to the show of authority. See United States v. Logan, 526 F. App'x 498, 499 (6th Cir. 2013) (holding that where officer drew his weapon and ordered defendant back into his vehicle, and defendant "kind of stutter stepped toward the passenger's seat where he originally was, and he kind of stutter stepped away from it, and went back and forth for a little bit," defendant's actions fell short of actual submission).

The court need not resolve this issue because Collins was ultimately seized when Officer Cisneros grabbed him by the arm, and because the seizure was not supported by reasonable suspicion,

- 10 -

the firearm evidence must be suppressed. As stated above, the Supreme Court in Torres held that "[t]he application of physical force to the body of a person with intent to restrain is a seizure, even if the force does not succeed in subduing the person." 141 S. Ct. at 994; see also California v. Hodari D., 499 U.S. 621, 626 (1991) ("An arrest requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority.") (emphasis in original). In other words, a seizure by physical force - as opposed to a seizure by a show of authority by the police - does not require that the defendant submit to the use of force or be subdued by it.[3] Torres, 141 S. Ct. at 1003.

When Officer Cisneros grabbed Collins's arm, he applied physical force with an intent to restrain. Officer Cisneros saw Collins backing away and blading his body, which he interpreted as an intent to flee. Officer Cisneros testified that he "reached" for Collins because "he was being detained at that moment" and "I knew he was attempting to flee." Because the officer intended to restrain Collins by grabbing his arm to prevent him from leaving, Collins was at that moment "seized" under Torres.

---

[3] In discussing the requirement that the use of force must be "with intent to restrain," the Court in Torres explained that "[i]n this opinion, we consider only force used to apprehend." Id. at 998-99. The Court also emphasized that "[t]he rule we announce today is narrow." Id. at 999.

The undersigned finds that Officer Cisneros lacked reasonable suspicion to initiate that seizure. A police officer may initiate an investigatory stop short of probable cause to arrest. United States v. Atchley, 474 F.3d 840, 848 (6th Cir. 2007). A brief investigatory stop is justified under the Fourth Amendment where "a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." Terry, 392 U.S. at 30; see also O'Malley v. City of Flint, 652 F.3d 662, 670 (6th Cir. 2011). "The officer must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." United States v. Gross, 662 F.3d 393, 399 (6th Cir. 2011). In evaluating whether an officer had a reasonable suspicion, the court must consider the totality of the facts and circumstances of which the officer was aware, including the contextual factor of the area's crime level. United States v. Davis, 514 F.3d 596, 608 (6th Cir. 2008). "Additionally, the experience of the law enforcement officer must be taken into account in the reasonable suspicion analysis[.]" United States v. McCauley, 548 F.3d 440, 445 (6th Cir. 2008). The court may consider all events up until the point of seizure. United States v. Johnson, 631 F. App'x 299, 302 (6th Cir. 2015).

Officer Cisneros was aware that Pendleton West is located in a high-crime area, based on his experience as an officer tasked

with going into high crime areas, the apartment complex's participation in the anti-trespass program, and the homicide investigation that brought him to Pendleton West that day. While this high-crime location factor on its own cannot create reasonable suspicion, it is relevant to the analysis. Lewis, 843 F. App'x at 690-91 (citing Illinois v. Wardlow, 528 U.S. 119, 124 (2000)). Additionally, Collins refused to remove his right hand from his sweatshirt and started backing away from Officer Cisneros, which is the type of non-cooperative and evasive behavior that can also factor into the reasonable suspicion analysis. Id. at 691 (citing United States v. Johnson, 620 F.3d 685, 694 (6th Cir. 2010)).

   However, Collins's presence in a high-crime area, refusal to show his hands, and backwards movement, viewed together, fall short of meeting the reasonable suspicion requirement. It was around 2:55 p.m. when Officer Cisneros saw Collins and his companion leaving the apartment complex. Neither individual was engaging in suspicious conduct, and Officer Cisneros had no indication that they were trespassing. Given the time of year, it should not have seemed unusual to Officer Cisneros to see someone wearing a sweatshirt with his hands tucked inside the front pocket. Although Officer Cisneros was generally concerned for his own safety, he had no information that Collins was armed. Cf. Lewis, 843 F. App'x at 691 (finding that there were several factors indicating

defendant may have been armed, including officer seeing defendant patting his right hip, noticing a bulge in defendant's waistband area, and observing defendant standing in a bladed position).[4] Collins did not comply with the officer's order to show his hands, but as the Supreme Court has stated, "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." Bostick, 501 U.S. at 437. And while an individual's unprovoked headlong flight upon seeing the police can weigh in favor of reasonable suspicion, see Wardlow, 528 U.S. at 124-25, Collins did not flee when he first saw Officer Cisneros or during their encounter. He told the officer that he did not have any identification, started to comply with the

---

[4] In Lewis, the majority found that the defendant standing in a "bladed position," coupled with the officer's testimony that he recognized this as a "common stance for people to use who are carrying guns," along with other factors such as the officer seeing the defendant patting his right hip, testimony from the officer that "people often subconsciously pat the area where they are carrying a gun," and the officer noticing a bulge in the defendant's waistband, were "several factors that indicated to [the officer] that Lewis may have been armed." Lewis, 843 F. App'x at 691. In United States v. Chandler, 437 F. App'x 420 (6th Cir. 2011), a case cited by Lewis, the court found lawful a traffic stop during which an officer patted down the defendant after the officer observed the defendant assume a bladed position. Id. at 424, 426. Chandler involved several additional factors that supported reasonable suspicion for the traffic stop and the court's finding that the investigative detention was "reasonable and diligent," including reliable information from a known informant that Chandler trafficked in large quantities of Oxycontin and that Chandler would be traveling to Northern Ohio to obtain Oxycontin on the day his vehicle was stopped. Id. at 426.

officer's orders to show his hands, and then began to back away. "[I]t is clear that walking away from an officer does not create a reasonable suspicion. In those cases in which we have found that walking away from police does contribute to reasonable suspicion, specific facts have shown that the defendant's behavior was otherwise suspicious." United States v. Beauchamp, 659 F.3d 560, 570-71 (6th Cir. 2011) (internal citations omitted).

In sum, the undersigned submits that Officer Cisneros lacked reasonable suspicion to seize Collins. Because the gun was discovered as a direct result of the unlawful seizure, that evidence must be suppressed. See Wong Sun v. United States, 371 U.S. 471, 485 (1963).

### III. RECOMMENDATION

For the reasons above, it is recommended that the motion to suppress be granted.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

July 6, 2021
Date

**NOTICE**

**WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THIS REPORT AND RECOMMENDED DISPOSITION, ANY PARTY MAY SERVE AND FILE SPECIFIC WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS. ANY PARTY MAY RESPOND TO ANOTHER PARTY'S**

**OBJECTIONS WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.**